FILED
07/19/2021
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2021 Session

## STATE OF TENNESSEE v. DAVID THOMAS TIDWELL

**Appeal from the Circuit Court for Obion County
No. CC-19-CR-50 Jeff Parham, Judge**

### No. W2020-00199-CCA-R3-CD

The Defendant was indicted by an Obion County Grand Jury of aggravated assault in that he "feloniously and intentionally caused serious bodily injury to Ashley Tidwell in violation of T.C.A. §39-13-102(a)(1)(A), a class C felony[.]" A jury convicted the Defendant of the lesser included offense of misdemeanor reckless endangerment. T.C.A. §39-13-103. The trial court imposed a sentence of eleven months and twenty-nine days, suspended to supervised probation following the service of 180 days in confinement. In this appeal as of right, the Defendant contends that the evidence was insufficient to sustain his conviction and that the trial court erred in imposing the sentence. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

Camille R. McMullen, J., delivered the opinion of the court, in which D. Kelly Thomas, Jr., and J. Ross Dyer, JJ., joined.

James T. Powell, Martin, Tennessee, for the Defendant, David Thomas Tidwell.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Tommy Thomas, District Attorney General; and Melinda Meador, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The following proof was adduced at the Defendant's two-day trial on September 5 and 6, 2019. Ashley Butler, the Defendant's former wife and victim in this case, testified that on June 30, 2018, she and the Defendant had plans to attend a concert. She awoke that morning and did not feel well and attempted to "get out of it." She and the Defendant then began to argue, and the victim reluctantly attended the concert. At around 6:30 that night,

they drove to the concert in the Defendant's Dodge Ram truck, and they were joined by the victim's co-worker. The Defendant had consumed a "40-ounce beer" prior to the concert, and they purchased another two cases of beer on the way to the concert. When they arrived at the concert, the Defendant sat on the cooler containing the beer, and each time the victim wanted a beer, she had to ask him for permission. The victim drank beer that night and explained that she asked the Defendant for permission for beer "at least seven or eight times." She described the events up until this point as "fun," and she said they left the concert around midnight.

After dropping off her co-worker, the victim and the Defendant began to drive home. During the drive, the Defendant's cell phone kept ringing. The victim told the Defendant that he could answer it and that she knew he had been having an affair. An argument ensued. The Defendant became angry and started calling the victim derogatory names. He eventually stopped the truck in the middle of the road. At this point, they were within a ten-minute walk and a three-minute drive to her home. The victim described what happened next as follows:

> I told him I was going to get out and walk home. I opened my door, and I slid onto the side of the seat. This (indicating) -- my right leg was on the ground. And I reached over and I grabbed my purse. And he tried to grab for my left hand at first. And I kind of went – slid sideways, and I reached over and grabbed it with my left – with my right hand.

As the victim reached for her purse on the floorboard of the truck, the Defendant grabbed her hand, hit the gas pedal of the truck, and dragged the victim. The victim said as the momentum of the truck took hold, both of her legs fell outside of the truck. She screamed, but the Defendant would not let go of her arm. She remembered "rolling" and being "jerked." When the victim was freed from the truck, she recalled the smell of her blood and the exhaust from the Defendant's truck. She was on the side of the white line in the middle of the road and rolled herself into a ditch. She said the Defendant stopped the truck, approached her in the ditch, and laughingly said, "You're a goddamn dumb ass. You goddamn dumb ass. You're f------ stupid. You f------ jumped." She said she was crying and holding her arm when the Defendant came up behind her, "jerked" her arm, and pushed her back into the truck.

While in the truck, the victim attempted to "flag down" another truck, but the Defendant told her, "If they f----- stop, you're going to f----- regret it." The victim tried to call 911, but the Defendant slapped the phone out of her hand. She said she was hurting, but the Defendant refused to help her. When they arrived home, the victim's mother, who lived with them, asked what happened. The Defendant again said that the victim jumped from the truck, but the victim denied doing so. The victim's mother took her to the hospital

upon seeing her bloody legs and torn clothes. The victim arrived at the hospital around 2 a.m., received medical treatment, and stayed in the emergency room until 8 a.m. The police arrived at the hospital, and the victim declined to press charges against the Defendant that night, stating he was alone with her children. She said the Defendant was later arrested and that she had only seen him for court proceedings and their divorce matter. Twenty-one photographs depicting the victim's clothing, shoes, and injuries from the night of the offense were admitted as a collective exhibit at trial.

On cross-examination, the victim affirmed that she did not spend the night at the hospital. She denied telling the hospital doctor that she either did not know if she "held on or fell out of" the truck. She insisted that she did not fall out of the truck that night. Upon being shown the doctor's report, she agreed that it reflected she was unsure of how her injuries occurred that night. However, she testified that she did not recall telling the doctor the information reflected in the hospital report. She described her position in the truck that night in relation to her purse and the Defendant based upon photographs of the Defendant's truck which were admitted into evidence as a collective exhibit. She agreed that she remarried and had another child with someone else three days after divorcing the Defendant. She denied being intoxicated on the night of the offense.

Dr. Robert Turner, an emergency room physician of twenty-five years' experience, testified that he was working in the emergency room on the night of the offense and attended to the victim. She was crying and expressed pain in various parts of her body including her shoulder, chest, torso, abdomen, and feet. Dr. Turner said most of the victim's injuries were abraded or consisted of abrasions. He distinguished the injuries to her torso from "road rash" and characterized them as consistent with "being dragged across asphalt[.]" He explained that the victim's injuries were similar to what he had seen with being dragged across asphalt on a motorcycle. The victim told him that she had been "forced" from a truck, and Dr. Turner did not recall any other specifics about the accident.

Theresa Jobe, the victim's mother, testified and corroborated her daughter's testimony in regard to what occurred when they arrived home on the night of the offense. She was taken aback when the Defendant told her she needed to take her daughter to the emergency room because he called her daughter a "dumb ass" or "stupid ass" while in front of the children. On cross-examination, she agreed that the Defendant twice told her that her daughter had jumped from the truck on the night of the offense.

Officer Jamie Hall, employed at the time of the offense with the Obion County Sheriff's Department, responded to the hospital and was advised that the victim had been in a "domestic where her husband drug her behind his vehicle for an unknown amount of feet[.]" He received this information directly from dispatch. Upon his arrival at the hospital, he observed staff, the victim's mother, and the victim, who was crying and

distraught. He then took a statement from the victim regarding the events leading up to the offense. He said the victim acknowledged she had been drinking that night but she was not "falling over drunk[.]" Officer Hall recalled the victim declined to press charges that night. He told her that he was bringing charges because of her emotional state at the hospital and that the district attorney would ultimately make the determination. Officer Hall left the hospital and proceeded to locate the Defendant. The Defendant was found at home, appeared to be inebriated, and exclaimed, "she jumped" and "it wasn't even me" at the time of arrest.

The State offered no further witnesses; however, based on defense counsel's repeated questions concerning the statement the victim made within the hospital report, a single page from her hospital records was admitted into evidence without objection. In substance, the report categorized the victim's chief complaint as "assault victim" and reflected her arrival complaint as "got dragged by a car." It further stated, in relevant part, as follows:

> [Boyfriend] ordered her out of the truck. She gathered her purse, and before she got out, he gunned the truck and she was dragged some hour [sic]. She doesn't know if she held on or fell out or what happened. She doesn't want to press charges.

The Defendant testified and agreed he had attended a concert along with victim and her co-worker on the night of the offense. He denied having a 40-ounce beer prior to the concert. He agreed, however, that they had taken two cases of beer with them to the concert and shared it amongst the three of them. He recalled the victim had "six or seven" beers. He kept the cooler next to his leg only to avoid other concert goers from taking their beer. He agreed that they may have been "tipsy" prior to leaving the concert. They took the victim's co-worker home and proceeded to drive home. In contrast to the victim's testimony, the Defendant denied that his phone ever rang on the way home. He said the victim simply "started accusing [him] of cheating, and then just kept going on, just repeatedly . . ." He responded to her by "just saying okay" because he did not want to escalate the situation. He said the argument lasted approximately fifteen minutes. He then began to slow the truck down with the intent to get out and give the victim the truck to drive home. He explained as follows:

> Went to slow down. Never come to a complete stop. And the next thing I heard was a seat belt click and a door open, and then [the victim] was gone.

Thirty seconds later, when the Defendant realized the victim was no longer in the truck, he stopped the truck, got out, and assisted her. He said the victim was in a ditch, and he picked her up and placed her in the truck. He agreed that he called the victim a "stupid

- 4 -

ass" on the night of the offense for jumping out of the truck. He also said that he was worried about the victim's injuries for doing so. He said he asked her mother to take the victim to the hospital instead of taking her himself because he had been drinking. He denied grabbing or holding the victim's arm from the truck on the night of the offense. He explained further that due to the shifter on the center console of his truck situated between the driver and the passenger seat, he would have been unable to reach the victim's arm that night. He believed the victim had more to drink than he did on the night of the offense. The Defendant also believed that the victim's statement in the hospital report pertaining to not knowing whether she jumped or fell out of the truck was accurate.

Following the closing argument of the parties, the jury convicted the Defendant of the lesser included misdemeanor offense of reckless endangerment. On October 21, 2019, the trial court conducted a sentencing hearing and noted that the jury was mistakenly charged with misdemeanor reckless endangerment instead of felony reckless aggravated assault. The trial court explained that the jury instruction did not include the definition of deadly weapon which was required for the felony conviction.[1] During the sentencing hearing, the pre-sentence investigation report was admitted into evidence, and the victim, the Defendant, and Darrell Smothers testified.

The victim testified that since the date of the offense she had experienced PTSD, anxiety, and depression, for which she received counseling. She had been unable to work due to her broken collarbone and multiple surgeries. She said she would no longer be able to work as a postal clerk because her injuries prohibited her from lifting more than ten pounds. She and her son enrolled in therapy, and she had remarried. She reaffirmed much of her trial testimony concerning the Defendant's failure to render any aid on the night of the offense. She also stated that when the Defendant carried her back to the truck, he pressed his body against hers and had an erection. On cross-examination, the victim said she had worked following the accident and had only recently stopped working after the birth of her daughter. She agreed she had no outstanding bills at the time of the hearing.

Darrell Smothers, a probation officer with the Tennessee Department of Correction and Community Supervision in Dyersburg, testified on behalf of the Defendant. He prepared the presentence report, admitted into evidence, and explained that the Defendant had no criminal history other than three speeding tickets. The Defendant also held an emergency medical responder license and "different licenses with reference to the

---

[1] At the motion for new trial hearing, the trial court clarified that the indictment in this case charged the Defendant with aggravated assault based solely upon serious bodily injury and, as such, the trial court could not have charged felony reckless endangerment with a dangerous weapon as a lesser included offense. See State v. Moore, 77 S.W.3d 132, 136 (Tenn. 2002); State v. Morrow, No. W2002-02065-CCA-R3-CD, 2003 WL 22848974, at *6 (Tenn. Crim. App. Nov. 25, 2003).

profession of firefighting." The Defendant had a GED, no history of drug or alcohol abuse, and had consistently maintained a job throughout his life. On cross-examination, Officer Smothers agreed that the Defendant suggested that the victim was responsible for the argument between them on the night of the offense. The Defendant also advised that "drinking had never caused him any problems."

The Defendant testified that he was currently employed at a home remodeling and repair company and received an hourly pay of $13. He affirmed he had never been arrested and had previously worked as a firefighter and a prison officer. He was currently renting a home, and if required to go to jail, would likely lose it. Since the date of the offense, he had completed a four-hour counseling class.

In sentencing the Defendant, the trial court engaged in extensive reasoning and stated as follows:

> We're here in 19-CR-50, State of Tennessee versus David Thomas Tidwell. This cause was here today on the sentencing of the defendant for a jury conviction for the offense of reckless endangerment. As previously corrected, the jury thought they convicted him of felony reckless endangerment; but, because the essential elements were not all included he was found guilty of the misdemeanor reckless endangerment because deadly weapon in the actual jury instructions were left out.
>
> In determining the appropriate sentence for this offense[,]the Court has considered the evidence that was presented at the trial. I've gone back through all the notes. The Court's also considered the evidence that was presented at today's sentencing hearing, the pre-sentence report which was marked as exhibit 1 and amended, the principles of sentencing, and arguments made for a sentencing alternative, the nature and characteristic of the criminal conduct involved, the evidence and information offered by the parties on enhancement factors – no mitigating factors were argued -- statistical information provided by the AOC as to sentencing practices, the statement of the defendant in his own behalf, and the defendant's potential for rehabilitation and treatment, from all of which the Court -- I don't think the Court has to make a finding since it's a misdemeanor. But I would make a finding that he is a Range 1 standard offender. He is not an especially mitigated offender even though he has no prior convictions. I would also have to find that there are no enhancement factors. And I will be making a finding as to enhancement factors.

Pursuant to 40-35-114, the Court makes the following enhancement factors which are not themselves essential elements of the offense. Now, the State wanted enhancement factor number 7, that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. I didn't hear any of that at the trial; although, the victim did testify about an erection today. I'm not going to make that finding as an enhancement factor. And I'll explain that later.

Enhancement factor number 9, that the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense I am going to find that as an enhancement factor. Although it was not considered by the jury, I find that the automobile that the defendant was driving was used as a deadly weapon during the commission of the offense.

Enhancement factor number 10 has been requested by the State. That the defendant had no hesitation in committing a crime when the risk of human life was high. I am going to make that finding. This victim could have easily been killed while the defendant was dragging her down the road. Could have easily been run over and killed. So[,] I am going to make that finding.

Then they asked for enhancement factor number 17, that the defendant intentionally selected the person against whom the crime was committed or selected the property that was damaged or otherwise affected by the crime in whole or in part because of the defendant's belief or perception regarding, in this case race -- no -- in this case gender of that person or owner or occupant of the property. I'm not going to make the finding that that's an enhancement factor. Not that I don't believe the testimony of the victim that there's been a history of domestic violence. I just don't think, based on the proof today, that enhancement factor is carried.

Pursuant to 40-35-114, the Court makes no finding as to mitigating factors because none were argued.

Now, before I get into the probation consideration, the Court is going to make a credibility finding. I went back through my notes from the trial. And about halfway through the defendant's testimony I made a note that I did not find the defendant credible. I did not believe his story could hold up. Not that everything that the victim said was absolutely true or believable; but, I did find the majority of her testimony credible.

- 7 -

So[,] the Court has considered the following in deciding to deny an alternative sentence to incarceration. The pre-sentence report, which was marked exhibit 1, as amended, and including the victim impact statement. The Court considered the defendant's physical and mental condition and social history, particularly that he was recently tested in a psychological evaluation and determined to have anger issues. That was his testimony today. The Court considered the facts and circumstances surrounding the offense and the nature and circumstances of the criminal conduct involved.

In this case the testimony was that the parties were drinking that night, had gone to Bikini Bottoms to a concert. All the parties were drinking. The victim and her friend were probably drinking more than the defendant. Although it's unclear how much the defendant actually drank. But he admitted on the witness stand today he drank more than two.

They left Bikini Bottoms, had driven for approximately an hour on the way home. Because that takes into account taking the victim's friend home. And by the testimony at the trial she lived some distance from Bikini Bottoms. But particularly she lived at least 30 minutes from the defendant and the victim's house. After dropping her off they began arguing on the way home. And just before they arrived at home the defendant testified he thought he would stop and he would walk the rest of the way home. That's where the story really gets unbelievable. That they had driven for an hour, and within - and I think he said it was a quarter of a mile he decides to stop, not drive on home, but stop, and he's going to get out and walk. But that doesn't happen. However [,] the victim is removed from the vehicle, whether -- and I don't know. And I don't know that the proof is clear on - because she said she didn't know other than she was getting out and her leg -- her right leg was on the ground. What she did remember is she didn't jump. But she was getting out of the vehicle, she reached back in to get her bag, she says the defendant grabbed her arm and drug her and drug her down the road. And this is clearly what happened. Whether or not he grabbed her arm I've already determined his credibility. But even if she were just hung on the side of the vehicle like he said, he drug her down the road. She screamed.

They entered these pictures that were horrendous. Scars where she had lost skin on her chest, her legs, a broken collarbone. The emergency room doctor came and testified that this was not your ordinary case of road rash. It was almost worse than your ordinary case of road rash.

The victim gets back in the truck, with the help of the defendant, I'm assuming. But here the defendant didn't take her to the hospital. The defendant, even though he testified a few minutes ago to his favor, has an emergency responder medical license, he says he didn't look at her injuries because it was dark. But you took her home. You didn't take her to the hospital. You didn't give her medical treatment. What you did was you took her home and you left her in the truck and went in and told her mother to take her to the hospital. And I hate to say these words in court. But you told her mother that the dumb ass jumped out of the truck. You didn't assist her. Your concern appeared to be because you had been drinking. Although you had driven an hour already. You didn't want to drive her to the hospital.

The Court's also considered the previous actions and character of the defendant, including the fact that you did not render aid and including the other incidents of domestic abuse that was included within the victim impact statement.

The Court's also considered whether or not a sentence of full probation would unduly depreciate the seriousness of the offense. I do find that that is the case. Whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses, I do find that, from the standpoint of domestic violence in this country. And whether or not the offense was particularly heinous, I find that dragging the victim down the road is particularly heinous.

The Court is limited in the sentence it can give, to some extent, and the fact that you will not have a felony conviction. But the Court's going to sentence you to a term of 11 months 29 days to serve 180 days of continuous confinement in the Obion County Jail. There's going to be a no contact order between you and the victim.

The Defendant filed a motion for new trial, challenging his sentence and the trial court's application of various enhancement factors. The State asserted that because the Defendant was convicted of a misdemeanor only, the Defendant's sentencing issues were largely moot. After argument of the parties, the trial court agreed that it had misapplied enhancement factor 10, that the Defendant had no hesitation in committing a crime when the risk of human life was high, but it did not alter the sentence originally imposed. The Defendant filed a timely notice of appeal. His case is now properly before this court for review.

**ANALYSIS**

The Defendant argues the evidence was insufficient to sustain his conviction of reckless endangerment. The entirety of his argument on this issue is as follows: "[t]he Appellant avers that even viewing the evidence in the light most favorable to the prosecution, the evidence was insufficient to find the Appellant guilty for the crime for which he was convicted." Because the Defendant did not provide any argument in his brief, the State asserts this issue is waived. In any event, the State argues, and we agree, that the evidence was sufficient to support the Defendant's conviction of misdemeanor reckless endangerment.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Misdemeanor reckless endangerment occurs when a person recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury. Tenn. Code Ann. § 39-13-103(a), (b)(1) (2019). To prove misdemeanor reckless endangerment, the State must show that the defendant engaged in: (1) reckless

conduct which (2) placed another person in danger of death or serious bodily injury. State v. Rush, 50 S.W.3d 424, 431-32 (Tenn. 2001), as amended (July 25, 2001). The Tennessee Supreme Court has held that "for the threat of death or serious bodily injury to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn.1999) (citing State v. Fox, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)).

Viewing the evidence in the light most favorable to the State, on the night of the offense, the Defendant and the victim attended a concert and drank alcohol to excess throughout the course of the evening. On the return drive home, an argument ensued between the Defendant and the victim. As the victim reached for her purse on the floorboard of the truck, the Defendant grabbed her hand, hit the gas pedal of the truck, and dragged the victim while her body was hanging outside the truck. The victim was dragged outside of the truck for approximately thirty seconds. The victim screamed, but the Defendant would not let go of her arm. She remembered "rolling" and being "jerked." When the victim was freed from the truck, she rolled her body into a ditch off the side of the road. The Defendant did not immediately render aid to the victim, but instead chose to drive her home and tell her mother to take her to the hospital. The emergency room physician characterized the victim's injuries as consistent with being dragged across asphalt. The photographs of the victim's injuries as well as the victim's testimony established that she suffered extensive injuries as a result of being dragged by the Defendant in his truck. This is more than sufficient evidence for a rational juror to find the Defendant engaged in reckless conduct that placed the victim in danger of death or serious bodily injury. The Defendant is not entitled to relief.

The Defendant's remaining arguments on appeal challenge the trial court's imposition of sentence. He claims the trial court erred in (1) allowing testimony during the sentencing hearing regarding the effect that the Defendant's prior incidents of abuse had on the victim's children; (2) applying enhancement factor nine, that the defendant possessed or used a deadly weapon during the commission of the offense; (3) failing to reduce the Defendant's sentence upon reconsideration of enhancement factor ten and determining it was inapplicable; and (4) failing to grant an alternative sentence of complete probation based upon the Defendant's lack of criminal history and low likelihood to reoffend. In response, the State contends that the trial court properly considered the Defendant's prior actions concerning the victim's son, that consideration of enhancement factor nine was properly applied in accord with State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000), that reconsideration of enhancement factor ten at the motion for new trial did not invalidate the Defendant's original sentence; and that the trial court did not abuse its discretion in denying alternative sentencing and ordering split confinement. We agree with the State.

A trial court's sentencing determinations in felony cases are reviewed under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). An abuse of discretion standard, accompanied by a presumption of reasonableness, also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). To date, the Tennessee Supreme Court has not addressed whether the abuse of discretion standard with a presumption of reasonableness applies to misdemeanor sentencing. Notwithstanding, the reasoning espoused in King, that Bise applies to "all sentencing decisions," suggests that it is the appropriate standard of review to apply to misdemeanor sentencing cases as well. See State v. King, 432 S.W.3d 316 (Tenn. 2014) (emphasis added). Moreover, this court has previously applied the Bise standard of review to misdemeanor sentencing cases. See State v. Michael Glen Walsh, No. E2012-00805-CCA-R3-CD, 2013 WL 1636661, at *4 (Tenn. Crim. App. Apr. 17, 2013); State v. Sue Ann Christopher, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *7 (Tenn. Crim. App. Mar. 14, 2013). Therefore, we will do the same in this case.

A trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2019). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2019), Sentencing Comm'n Comments.

The Defendant was convicted of reckless endangerment, a Class A misdemeanor, which carries a maximum sentence of eleven months and twenty-nine days. See id. § 39-13-103(a), (b)(1), 40-35-111(e)(1) (2019). Sentences for misdemeanor offenses must be specific and in accordance with the principles, purpose, and goals of the Criminal Sentencing Reform Act of 1989. Id. §§ 40-35-104, -302 (2019). The sentencing court is granted considerable latitude in misdemeanor sentencing. State v. Johnson, 15 S.W.3d

- 12 -

515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)).  While a separate sentencing hearing is not mandatory in misdemeanor cases, the court must provide the defendant with a reasonable opportunity to be heard regarding the length and manner of the sentence.  See Tenn. Code Ann. § 40-35-302(a) (2019).

"[A] misdemeanor offender must be sentenced to an authorized determinant sentence [,]" and "a percentage of that sentence, which the offender must serve before becoming eligible for consideration for rehabilitative programs, must be designated." State v. Palmer, 902 S.W.2d 391, 394 (Tenn. 1995).  Typically, a percentage not greater than seventy-five percent of the sentence should be fixed for a misdemeanor offender.  Id. at 393-94; Tenn. Code Ann. § 40-35-302(d) (2019).

An individual convicted of a misdemeanor has no presumption of entitlement to a minimum sentence.  Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997); State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994)).  The misdemeanor sentencing statute requires that the trial court consider the purposes and principles of sentencing when calculating the percentage of the sentence to be served in confinement prior to "consideration for work release, furlough, trusty status and related rehabilitative programs."  Tenn. Code Ann. § 40-35-302(b), (d) (2019). However, there is no strict requirement that the trial court make findings on the record regarding the percentage of the defendant's sentence to be served in confinement:

> [W]hile the better practice is to make findings on the record when fixing a percentage of a defendant's sentence to be served in incarceration, a trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute.

Troutman, 979 S.W.2d at 274 (footnote omitted).

As reflected above, prior to imposing sentence, the trial court engaged in an extensive analysis and expressly considered the purposes and principles of sentencing. With regard to the testimony at sentencing concerning the effect of the Defendant's prior incidents of abuse had on the victim's children, the record shows the State asked the victim about her son's interaction with the Defendant.  The victim responded in narrative form and began to talk about her son's speech impediment, and she observed the Defendant spank her son for things she had done.  At several times throughout this line of questioning, the State attempted to engage the victim further on this subject and defense counsel objected. The trial court repeatedly sustained the objections but ultimately permitted the State to ask the victim if she observed her son behave differently after an incident between the Defendant and the victim.  As the victim answered this question, she again began to

talk about the behavioral differences in the children and defense counsel again objected. At this point, the trial court reprimanded the State and sought the relevance of the line of questioning. The trial court stated, "If you want to address what [the Defendant] has supposedly done to this witness, fine. But the children are not involved in this case at the moment." Given this exchange, we believe any testimony or alleged prior bad acts of the Defendant concerning the victim's children had little to no involvement in the trial court's overall sentencing determination.

With regard to enhancement factor nine, that the defendant possessed or used a deadly weapon during the commission of the offense, as the State points out, the trial court was well within its authority in applying an enhancement factor based on facts underlying an offense for which a defendant has been acquitted so long as the facts are established by a preponderance of the evidence. Winfield, 23 S.W.3d at 283. The trial court determined, and the preponderance of the evidence in the record reflects, that the Defendant used his truck as a deadly weapon in the commission of the misdemeanor reckless assault. As for the remaining allegations of error, failing to reduce the Defendant's sentence upon reconsideration of enhancement factor ten and failing to grant an alternative sentence of complete probation based upon the Defendant's lack of criminal history and low likelihood to reoffend, we conclude, based upon the considerable latitude afforded to the trial court in misdemeanor sentencing, that the trial court properly imposed sentencing in this case in accordance with the principles, purpose, and goals of the Criminal Sentencing Reform Act of 1989. Id. §§ 40-35-104, -302 (2019). The Defendant is not entitled to relief.

## CONCLUSION

Based upon the above reasoning and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 14 -